

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Western Division

99 NOV 12 AM 11:05

U.S. DISTRICT COURT
N.D. OF ALABAMA

SHIRLEY CLEVELAND, ALLEN )
DUKES, BILLY DUKES, MARSHIC )
DUKES, DOROTHY JACKSON, )
GWENDOLYN MCMILLIAN, )           No. CV-95-P-1137-W
WYNDELL MCMILLIAN, AND )
CECILIA SHOEMAKER, )
    Plaintiffs; )
     )
-vs.- )
     )
BE&K, INC., )
    Defendant. )
     )

ENTERED
NOV 12 1999

OPINION

    The defendant, BE&K, is a construction and engineering company that operates in the southeast. On May 4, 1995, fifteen former and current BE&K employees filed a class action against the defendant styled CV95-P-1137-W.[1] On August 14, 1996, the plaintiffs filed an amended complaint adding Shirley Cleveland as a plaintiff. In September of 1996, the above-captioned eight plaintiffs obtained different counsel and filed a motion to sever themselves from the class action. Claims of seven other plaintiffs were severed, dismissed and refiled as CV97-P-1269-W. In August, 1997, the remaining plaintiffs-- Marshic Dukes, Billy Dukes, Allen Dukes, Dorothy Jackson, Wyndell McMillian, Gwendolyn McMillian, Cecilia Shoemaker and Shirley

---

[1]On February 4, 1997 the court dismissed the class allegations.

100

Cleveland-- filed an amended complaint.[2] They state race and sex discrimination claims under Title VII, § 1981, and supplemental state law claims.

Several of the plaintiffs brought hostile work environment claims based on similar allegations. These claims are due to be dismissed. As to each plaintiff's claims of disparate treatment based on race or sex, the court will address the factual and legal claims of each plaintiff separately. For the purpose of the motion for summary judgment, the court considers the presented evidence in the light most favorable to the plaintiffs.

Hostile Work Environment Claims

Four female plaintiffs have pending hostile work environment claims based on similar allegations of racial and sexual harassment.[3] They allege that female employees are subject to sexually harassing comments by supervisors and other workers, and that the bathroom s ("port-a-johns") are filled with sexist, sexually explicit, and racist graffiti.

To succeed on a claim of discrimination based on a hostile work environment, the plaintiffs must show that the conditions of the workplace were objectively abusive and hostile. "When the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." See Harris v. Forklift Systems, 510 U.S. 17, 21

---

[2]On August 18, 1997 the claims of one of the original plaintiffs, Dora Thompson, were dismissed without prejudice.

[3]The plaintiffs that allege hostile work environment claims are Marshic Dukes, Cecilia Shoemaker, Gwendolyn McMillian, and Shirley Cleveland.

2

(1993); Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995).

The conduct and conditions that the plaintiffs complain of does not rise to the level of severity required for an actionable harassment claim. Additionally, the plaintiffs have admitted that BE&K took steps to eradicate the offending statements and drawings when the plaintiffs notified their supervisors. For example, both Marshic Dukes and Gwendolyn McMillian admitted in their depositions that when they complained to Joseph Calderone (a BE&K supervisor) about the graffiti in the bathrooms, it was painted over. See Dep. of M. Dukes, 138-39; Dep. of G. McMillian, 142-43. Cecilia Shoemaker admitted in her deposition that she never complained to BE&K management about the graffiti. See Dep. of C. Shoemaker, 107.

The plaintiffs allege that they have overheard racist and sexist comments at the worksite. To constitute an abusive working environment under Title VII, racial slurs "[have] to be so 'commonplace, overt and denigrating that they create[] an atmosphere charged with racial hostility.'" Edwards, 49 F.3d at 1521 (quoting EEOC v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990). The specific allegations of the plaintiffs do not meet this standard. Most of the racial slurs complained of were occasional remarks by co-employees. Some of the cursing described in the plaintiffs' complaint was not racially motivated; for example, Marshic Dukes alleged that she was cursed at by Calderone, yet admitted that Calderone cursed at everyone, not just black employees. See Dukes Dep. at 101-02. The plaintiffs have not submitted evidence from which a reasonable jury could conclude that these incidents constituted a hostile work environment. Therefore, the defendant's motion for summary judgment is due to be granted as to the plaintiffs' hostile work environment claims.

Disparate Treatment Claims

To succeed on a Title VII claim of disparate treatment on the basis of race, the plaintiff must prove that the defendant's employment decisions were motivated by discriminatory intent. See Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 986 (1988). The plaintiff can prove intentional discrimination by presenting direct evidence of a decisionmaker's discriminatory intent, see Buckley v. Hospital Corp. of America, Inc., 758 F.2d 1525, 1529-30 (11th Cir. 1985), or by stating a case based on circumstantial evidence. See McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).

None of the plaintiffs have presented direct evidence that BE&K discriminated against them. Therefore, to state a claim of disparate treatment based on circumstantial evidence, each plaintiff must meet the familiar standard of the McDonnell-Douglas burden-shifting test. See id. at 802. The three-pronged analysis of McDonnell-Douglas and its progeny has been interpreted by manifold courts to apply to varied situations where an employee alleged that he or she suffered an adverse employment action.

First, the plaintiff must establish a prima facie case by showing that (1) he belongs to a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action and (4) that this adverse decision was causally related to the status of the plaintiff as a member of the protected class. See Jones v. Firestone Tire and Rubber Co., 977 F.2d 527, 537-38 (11th Cir. 1992). As Title VII claims necessarily involve different factual circumstances, the particular elements of a prima facie case will vary depending on each plaintiff's specific allegations. See McDonnell-Douglas, 411 U.S. at 802, n.13.

Second, the Mc-Donnell Douglas test provides the employer an opportunity to articulate

4

a legitimate, nondiscriminatory reason for the employment decision to rebut the presumption of discrimination raised by the plaintiff's prima facie case. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).

Third, once the defendant articulates a legitimate reason, the burden of proof shifts to the plaintiff to show that the asserted reason was a pretext for discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993). To survive a motion for summary judgment on a claim of disparate treatment, each plaintiff must present credible evidence such that a reasonable jury could find that the defendant was actually motivated by discriminatory intent.

In addition to their Title VII claims, all the plaintiffs except Shirley Cleveland brought claims of discrimination under 42 U.S.C. § 1981. Section 1981 requires that the plaintiff show intentional discrimination on the part of the defendant. General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391 (1982). The test for intentional discrimination is the same under both Title VII and § 1981. Grier v. Partek Industries, 903 F.Supp. 1480, 1491 (M.D.A.L. 1995). A plaintiff whose Title VII claims fail to meet the substantive standards for summary judgment necessarily cannot survive summary judgment on his or her claims under § 1981.


Allen Dukes

Dukes filed a claim against BE&K alleging that the defendant discriminated against him by failing to promote him to leadman. Pursuant to a Stipulation of Dismissal filed by the parties, the court dismissed Dukes' claims against BE&K on December 30, 1997.

5

Dorothy Jackson

In the original complaint, Jackson brought claims of racial and gender discrimination under Title VII and § 1981, as well as supplemental state law tort claims of Invasion of Privacy, Outrage and Battery. On August 12, 1997, the parties submitted a Joint Stipulation of Dismissal (docket no. 54). However, her claims were never dismissed by the court. Pursuant to the parties' agreement, Jackson's claims are due to be dismissed with prejudice.

Gwendolyn McMillian

McMillian was employed by the defendant from October 14, 1994 to January 20, 1995. She began working for BE&K as a laborer. In this position, she was supervised by Joeseph Calderone. In her complaint, she alleges that Calderone required her to perform odious tasks that he did not require white employees to perform. These tasks included pushing a wheelbarrow of cement, scattering stones, and picking up trash that the plaintiff alleges he threw on the ground for her to pick up. Although she alleges that she was the only one required to perform these tasks, McMillian has not identified a single white employee in her department, male or female, who was exempt from similar duties.

The plaintiff also alleges that Calderone told her that women should be home taking care of their children. However, in her deposition she reveals that this statement was a response to her complaint that the work she was performing was too difficult for women. See Pl.'s Dep. 38-40. In this context, the comment is not significantly probative.

The plaintiff was promoted from the labor department to the instrumentation department in December, 1994. Her new supervisor in instrumentation was Mike Thomas. According to the

6

plaintiff, she told Thomas when she was first promoted that she was afraid of heights. At one point, she tried to climb and got sick; she had to be rescued by other employees. According to McMillian, Thomas then told her that she would not have to climb. The plaintiff alleges that when she was terminated in January, she was told that she was terminated because she refused to climb or to perform her job duties.[4]

McMillian claims that the true motivation for her termination was race discrimination; she alleges that white employees who are afraid of heights are not required to climb or are not discharged for refusing to do so. However, McMillian has failed to produce substantial evidence to constitute a prima facie case of discriminatory discharge. To do so, she must present evidence that the same conduct was engaged in by a member of a protected class and that employee did not suffer the adverse employment action. See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984). The evidence she presents is not sufficient to persuade a reasonable jury that BE&K intentionally discriminated against her.

McMillian states that a white employee, P.J., told the plaintiff that she had not been required to climb because she, P.J., was afraid of heights. However, P.J. was a wire puller, and not in the instrumentation department with McMillian. Therefore, P.J. is not similarly-situated to McMillain for the purpose of establishing a prima facie case of discrimination.[5]

---

[4]McMillian alleges that at the time she was terminated she was given the opportunity to return to the labor department, where she would not have to climb. The plaintiff refused to accept a demotion for a number of reasons: she did not like the work she had to perform as a laborer; there was a decrease in the pay rate; and she did not want to work for Calderone again.

[5]P.J., is however, similarly situated to another plaintiff, Marshic Dukes, who alleges that she was terminated for refusing to climb. See infra pp. 11-12.

7

The defendant has articulated a legitimate nondiscriminatory reason for terminating McMillian: her inability to climb when she was working in instrumentation and her refusal to accept a position in the labor department instead. The defendant argues that all employees in the instrumentation department were required to climb. The plaintiff has not refuted this statement, acknowledging in her deposition that she was not aware of any employee in instrumentation that was not required to climb. See Pl.'s Dep. at 288.

The plaintiff's evidence does not suggest that BE&K intentionally discriminated against McMillian on the basis of race or gender. In her deposition, the plaintiff describes a conversation with two white employees named Johnny and "Brenda"[6] who began working for BE&K after the plaintiff. McMillian testified that these two employees told her that they had no prior experience and were not taking a class to move into a craft, yet Johnny was made a millwright, and Brenda was moved into the toolroom before McMillian was promoted to instrumentation. See Pl.'s Dep. 164-68; 248-49. However, the plaintiff was promoted to instrumentation two months after she started at BE&K and was not terminated until she refused to climb. Her testimony about Johnny and "Brenda" is not sufficient for a reasonable jury to find that the true motivation for her termination was illegal discrimination. Therefore, the defendant's motion for summary judgment is due to be granted as to McMillian's claims.

Wyndell McMillian

McMillian was employed by the defendant as a electrician's helper from January 5, 1995

---

[6]The plaintiff was unsure if "Brenda" was the correct name of the employee.

8

to February 7, 1995. McMillian admits that he violated company policy by being absent for two days and late on a third. He failed to appear for work on February 1st and 3rd, 1995, and was thirty minutes late on February 4th. He claims, however, that BE&K's real reason for terminating him was either retaliation for his mother's complaints of discrimination against the company, race discrimination against him, or a combination of both.

McMillian claims that he was terminated in retaliation for his mother, Marshic Dukes, having complained of discriminatory work assignments to BE&K management and filing an EEOC charge. Dukes filed her charge on January 31, 1995, a week before McMillian was terminated.

To establish a prima facie case of retaliation, McMillian must show 1) that he engaged in statutorily protected activity; 2) that he suffered an adverse employment action; and 3) that there is a causal connection between his mother's complaints and his termination. See Meeks v. Computer Associates Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994).

McMillian fails to allege facts showing the requisite causal connection. If McMillian could show that BE&K was aware of his mother's EEOC charge at the time of his termination, he might have a viable claim for retaliation. However, the EEOC Notice of Charge of Discrimination, sent to BE&K as notification of Dukes' complaint, was dated February 8, 1995, the day after McMillian was terminated. McMillian argues that he was terminated also in retaliation for Dukes' oral complaints to management. However, he presents no evidence that from which a reasonable jury could conclude that was the real motivation behind his termination.

McMillian also claims that his termination for absenteeism and tardiness was actually motivated by racial discrimination because white employees who violated the same rules were not terminated. To state a prima facie case of discriminatory termination for misconduct, the plaintiff

must show that "the misconduct for which he was discharged was nearly identical to that engaged in by an employee outside the protected class whom the employer retained." Nix, 738 F.2d at 1185 (quoting Davin v. Delta Airlines, Inc., 678 F.2d 567, 570 (5th Cir. 1982)).

McMillian states in his deposition that he knew of one white employee on his shift, William, who was absent one day and was not terminated. However, William's one day of absenteeism is not misconduct "nearly identical" to McMillian's missing two days of work and arriving late on a third over the course of four days during his first month of employment with BE&K.

Additionally, BE&K has offered a legitimate motive for its actions: McMillian's frequent absences from work. McMillian has not submitted evidence from which a reasonable jury could conclude that this reason was pretextual. He presents deposition statements by Calderone to the effect that Calderone would try to talk to employees who were absent, and that it was company policy that after three reprimands employees could be terminated for absenteeism. These statements, however, do not show that the true motivation behind BE&K's actions was race discrimination. Even if this evidence tended to show that the proffered reason for his termination–frequent absenteeism– was false, that would not be enough to show that the real reason behind his termination was illegal discrimination. See Nix 738 F.2d at 1184-85 (citing Clark v. Huntsville Bd. of Educ., 717 F.2d 525, 529 (11th Cir. 1983). Therefore, summary judgment is due to be granted as to Wyndell McMillian's claims.

Marshic Dukes

Marshic Dukes is a black female who was hired as a laborer in October, 1994. In

10

December, 1994, the defendant promoted her to the position of electrician helper. The plaintiff claims that her supervisor in the electrical department, Mike Owens, required her to mop floors while white employees were not required to mop the floor. Dukes complained about working for Owens to Brenda Criddle, and was transferred to the position of wire puller. After her transfer, Dukes told Criddle that her new position was better. See Pl.'s Dep. at 129.

The plaintiff is afraid of heights, but did not inform Criddle of this. She says that she told Joe Calderone at the end of her training class, and he told her to let her foreman know. She told Billy Cassidy, the superintendant, that she is afraid of heights. On January 23, 1995, a leadman named Rex asked her to climb into a cable tray. When she refused, Don Connors (a foreman) and Chuck Ashley (a general foreman) ordered her to climb. Ashley told her to "get your damn ass in the tray," or come with him. When she refused to climb again, Ashley informed her that she was terminated. Dukes alleges that at the time of her termination, Ashley cursed her on the way to the office, and that she responded by calling him as "nasty teeth bastard."

Dukes claims that white employees who refused to climb into a cable tray were not discharged, including a white female named P.J. According to Dukes, P.J. told Rex that she was afraid of heights about a week before the plaintiff was discharged. Dukes claims that Rex never required P.J. to climb and submits two affidavits in support of that claim.

To state a prima facie case of discriminatory discharge for alleged 'misconduct,' Dukes must present credible evidence that the same conduct was engaged in by a person outside her protected class and that person was not discharged. Dukes presents evidence that P.J., a white employee, also refused to climb and was not terminated. The defendant argues in response that

11

P.J. was not similarly-situated to Dukes because she had a different supervisor.[7] Regardless, both Dukes and P.J. are wire-pullers at BE&K and are therefore similarly-situated for the purposes of a prima facie case.

BE&K offers as legitimate reasons for Dukes' termination her harassment of other workers, her refusal to climb when told to do so by her supervisor, and "insubordination." The defendant alleges that it received complaints from other employees that Dukes had harassed them because they had to climb.

As evidence of pretext, the plaintiff offers testimony that P.J., another wire-puller, was not terminated for refusing to climb. The plaintiff's personal knowledge that P.J. was not discharged for refusing to climb, in addition to the affidavits of two witnesses, is sufficient to create a factual dispute as to whether BE&K intentionally discriminated against the plaintiff. Therefore, the defendant's motion for summary judgment is due to be denied as to Marshic Dukes' claim of disparate treatment.

Billy Dukes

Dukes was employed by the defendant as a pipe fitter helper starting in October, 1994. He was laid off as part of a reduction in force and rehired in January, 1995, as an electrician helper. He was laid off a second time on April 21, 1995.

To state a prima facie case that he was discriminated against by being laid off, Dukes must show a variation of McDonnell-Douglas's four elements. He must produce substantial evidence

---

[7]P.J.'s supervisor was apparently a man named Wayne.

that individuals outside his protected class with comparable or lesser qualifications were retained. See Nix, 738 F.2d at 1185.

Dukes claims that when he was laid off, other employees were retained and moved to the paper machine. See Pl.'s Dep. 162-66. He offers the name of one employee, Wes, a white pipefitter helper who was allegedly retained at the time Dukes was laid off. His claim cannot survive summary judgment, however, because Dukes does not provide any evidence as to whether Wes or any other white employees had lesser or similar qualifications.

Prior to the plaintiff's second layoff, he received an on-the-job injury that required a light duty assignment. He was restricted from heavy lifting, bending, and climbing. Dukes was accordingly assigned to sharpen tungston bits in the rod room. After one day in the rod room, he alleges that a foreman named Tim got him out of the rod room and required him to sweep, shovel and take out trash. Duke alleges that these duties are not "light-duty" and that he was assigned to them based on his race. He offers the names of two white employees, Tim and Lisa, who he claims were kept in the toolroom when they were on light duty, and not required to sweep or pickup trash. See Pl.'s Dep. 168-70. However, Dukes offers no evidence of what those employees' injuries were or what type of restrictions had been placed on them.

BE&K offers legitimate, non-discriminatory reasons for its actions with respect to Dukes. It states that Dukes was laid off due to a reduction in force that is common to the construction industry, and that no other positions were available for him. BE&K argues that the tasks assigned to Dukes after his injury were light duty tasks, and the defendant has submitted evidence that Dukes was indeed kept on restricted duty.

Dukes was injured and sent to a doctor by BE&K on March 21, 1995. At that time, the

13

doctor recommended that he be placed on light duty for ten days. In a letter dated April 19, 1995, a second doctor wrote about Dukes "[i]t is possible that further restrictions will apply, but until I see him back for re-evaluation, I am going to keep him off of work. He has been kept on light duty which includes taking garbage out, sweeping floors, etc." Dukes has failed to present evidence to suggest that the work that he was required to perform did not qualify as "light duty," and therefore cannot show that BE&K's actions in requiring him to perform these tasks were a pretext for discrimination.

Dukes also alleges that he was called "nigga boy" by his foreman, Prince Murray, and that he heard several white men express a wish to return to slavery. These isolated statements do not rise to the level of actionable hostile work environment race discrimination or provide substantial evidence that BE&K was motivated by discriminatory intent in its employment decisions with respect to Dukes.

The plaintiff's complaint also alleges a claim under the Americans with Disabilities Act. Dukes has failed to brief the ADA issue to the court, and has essentially abandoned the issue. Therefore, the defendant's motion for summary judgment is due to be granted as to all of Billy Dukes' claims.

Cecilia Shoemaker

Shoemaker was employed as a laborer from November 4, 1994, to December 21, 1994, when she was discharged. She claims that the defendant discriminated against her on the basis of race by discharging her for throwing a broom at a supervisor.

Shoemaker alleges that she was harassed and verbally abused by her foreman, Bobby

14

Larrimore. She claims that he sent her for tools he did not need, forced her to work through her lunch breaks, and cursed at her constantly.[8]

According to Shoemaker, on one occasion, Larrimore asked the plaintiff to go find a wheelbarrow. He then told her, "that ain't where I told you to go get one, from the third floor." The plaintiff left and continued her work, and Larrimore wrote her up. The plaintiff allegedly called Calderone over and he asked her why she would not sign the write up. The plaintiff says she wrote on the paper that Larrimore was lying. She states that when she continued working, Larrimore told her to "[g]et you damn broom and your wheelbarrow." The plaintiff then threw a broom at Larrimore, but did not hit him.

To defeat defendant's motion for summary judgment, the facts as stated by the plaintiff must constitute a prima facie case. Additionally, she must submit evidence showing that the defendants' reasons for its employment actions are a pretext for intentional race discrimination. See Cooper-Houston v. Southern Railway Co., 37 F.3d 605, 605 (11th Cir. 1994).

The evidence submitted by the plaintiff does not support a finding that BE&K intentionally discriminated against Shoemaker. BE&K has proffered a legitimate reason for discharging the plaintiff: after less than two months on the job, she violated a company policy by throwing a tool at a fellow employee. Other than the plaintiff's assertion that "she did not hit him," she has presented no evidence that this reason is pretextual.

The plaintiff's evidence includes her testimony that she was cursed at by her supervisors and she was not promoted as quickly as white employees. Her testimony about these incidents

---

[8]As noted above, Shoemaker's allegations do not constitute a hostile work environment.

15

do not create an inference that the defendant acted with illegal motivation when it terminated Shoemaker.

The plaintiff alleges that she was cursed at by her supervisors, primarily Larrimore. However, her proffered testimony suggests while her supervisors and coworkers used profanity, it was not racial in nature. See Pl.'s Dep. at 93-94. Shoemaker's testimony that she was passed over for the position of lead man for a white male named Jimmy is not persuasive evidence that she was later discharged with racial intent. In her deposition, she states that Jimmy had been working at BE&K for three days, and she had been there "a week or two" at the time he was promoted. However, the plaintiff admitted in her deposition that she did not know what Jimmy's past work experiences or qualifications were. See Pl.'s Dep. at 109-110. Additionally, Shoemaker admitted in her deposition that BE&K offered to move up two other black females in her department. See Pl.'s Dep. at 108. In this context, BE&K's failure to promote Shoemaker during the six weeks she was employed with the company do not suggest that it was motivated by an illegal racial bias. Therefore, the defendant's motion for summary judgment is due to be granted as to Shoemaker's claims.

.

Shirley Cleveland

Cleveland has stated several claims against the defendant under Title VII, including hostile work environment on the basis of race, hostile work environment on the basis of sex, quid pro quo sexual harassment, and retaliation. She also states a supplemental state law claim of invasion of privacy.

Cleveland was employed by the defendant in its labor department. She was hired in

October, 1994, and was terminated by the defendant in March, 1995. According to the plaintiff, her first supervisor, William Steele, frequently made advances towards her. She alleges that he called her a "black bitch" and made comments about her body. One time, he told her to come over to his house and "ride his donkey."

In November 1994, Cleveland complained about Steele's conduct to Calderone. In response, Calderone transferred her to another supervisor. According to Cleveland, Calderone told her that "if anything similar happened she would be blamed." See Pl.'s Brief at 3. The plaintiff alleges that the "black bitch" comments continued, and that Steele drew a sexually graphic picture of her on the wall of a port-a-john. She claims that she told her new supervisor, Tony Wilkerson, that Steele continued to harass her. In her deposition, she alleges that Steele also touched her breast on one occasion and briefly locked her in a port-a-john. She also states that Steele made sexually inappropriate comments regarding her relationship with a white man.

After her transfer, the plaintiff alleges that she was sexually harassed by another supervisor, Zarro Gomez. The plaintiff alleges that Gomez told her that he would get her a job in the instrumentation department if she came home with him. According to Cleveland, she did not complain again to Calderone because she feared that she would be fired. In January, 1995, the plaintiff was promoted to an electrician's helper position. Later she was put on the night shift until she was laid off in March.

The plaintiff's Title VII claims are due to be dismissed as untimely. Cleveland filed an amended charge with the EEOC on October 20, 1995,[9] and received a Notice of Right To Sue on

---

[9]The defendant has not argued here that Cleveland filed her EEOC charge after 180 days had passed since her employment with BE&K. See Pl.'s Dep. 35-48. Cleveland filled out an

17

February 16, 1996. Cleveland was added as a plaintiff to this lawsuit ninety-seven days later on May 23, 1996, when her counsel sought to amend the Amended Complaint in this action to add her as a plaintiff.

The plaintiff argues that the single-filing rule, which permits a plaintiff to "piggy-back" off of a co-plaintiff's timely filing, applies here because co-plaintiff Dorothy Jackson timely filed this action after receiving her right-to-sue letter from the EEOC. In <u>Gitlitz v. Compagnie Nationale Air France</u>, 129 F.3d 554 (11th Cir. 1997), the Eleventh Circuit explicitly stated that the single-filing rule does not apply to a plaintiff who has filed her own EEOC charge. In <u>Gilitz</u>, a co-plaintiff named Collins sought received two right-to-sue letters from the EEOC. The second purported to extend his time to file suit for an additional ninety days. Finding that the second letter was ineffective to extend Collins' time to file, the court held that he could not piggyback his claim to Gilitz's. The court stated:

> A plaintiff who has not filed an individual EEOC charge may invoke the single filing rule where such plaintiff is similarly-situated to the person who actually filed an EEOC charge, and where the EEOC charge actually filed gave the employer notice of the collective or class-wide nature of the charge.... However, where a plaintiff has filed an individual EEOC charge, such a plaintiff should be required to rely upon his or her own EEOC charge, and cannot reasonably rely upon the other claimant's charge.

<u>Id</u>. at 558. Cleveland filed her own EEOC charge and therefore cannot piggyback off of Jackson's timely filing. Therefore, Cleveland's Title VII claims are barred as untimely.

---

EEOC questionnaire regarding her employment with BE&K, which the EEOC received on March 16, 1995. The court declines to address the issue of whether Cleveland filed an EEOC "charge" within 180 days of working at BE&K because she failed to file suit within the prescribed time period after she received her notice of right to sue.

Cleveland has also stated a claim of invasion of privacy under state law. To hold an employer liable for the intentional torts of its employees, she must show that the agent's acts were in the line and scope of his employment; were in furtherance of the BE&K's business; or that BE&K participated in, authorized, or ratified the wrongful acts. See Busby v. Truswal Systems Corp., 551 So.2d 322, 326 (Ala. 1989). The alleged facts do not indicate that the wrongful acts of the supervisors were in the line and scope of their employment or in furtherance of BE&K's construction business. In order to succeed on her invasion of privacy claim, the plaintiff must show that the defendant authorized, participated in, or ratified their conduct. This she fails to do.

Cleveland admits that when she first complained about Steele's conduct, she was transferred to a different supervisor. She later complained to Wilkerson, who told her that he would tell Calderone about the continuing harassment. Cleveland never told any one in BE&K management about the alleged conduct of Gomez. The plaintiff has not submitted sufficient evidence for a reasonable jury to find that the steps that Calderone and Wilkerson took to end the harassment, however ineffective, constituted "ratification" of the wrongful behavior by BE&K. Therefore, the defendant's motion for summary judgment is due to be granted as to all of Cleveland's claims.

## Conclusion

For the foregoing reasons, the defendant's motions for summary judgment is due to be granted as to all of the claims of the following plaintiffs: Gwendolyn McMillian, Wyndell McMillian, Billy Dukes, Cecilia Shoemaker, and Shirley Cleveland. The defendant's motion for summary judgment is due to be denied as to the discriminatory discharge claims of Marshic Dukes, and due to be granted as to her claims of hostile work environment. Pursuant to the parties

stipulation, the claims of Dorothy Jackson are due to be dismissed without prejudice.

Dated: _Nov. 10_, 1999

*/s/ Sam C. Pointer*

Chief Judge Sam C. Pointer, Jr.

Service List:
    Jefferey Bennit
    Richard A. Meelheim
    Christa H. Meelheim
    Cynthia Forman Wilkerson
    Lisa A. Schreter
    Stephen X. Munger
    John Derek Wales
    Mac C. Moorer